NOR-036393

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

IFAE INTERNATIONAL FINE ARTS
EXPOSITIONS, INC., f/k/a LESTER
EXPOSITIONS, INC.,

          Plaintiff,

vs.

DAVID MORRIS INTERNATIONAL
and NORWICH UNION INSURANCE
LIMITED,

          Defendants.

_____/

CASE NO. 03-14309-CIV-GRAHAM
Magistrate Lynch

### AMENDED NOTICE OF REMOVAL

Defendant, NORWICH UNION, files this Amended Notice of Removal of this action to the United States District Court for the Southern District of Florida, and in support thereof states as follows:

### STATE COURT ACTION

1.    This action was commenced on or about September 4, 2003, when a Complaint was filed by the Plaintiff in the Circuit Court of the Nineteenth Judicial Circuit in and for Martin County, Florida.  The Complaint was then served on the Defendant on September 22, 2003.

2.    This suit is a civil action in which Plaintiff alleges that Defendant NORWICH UNION INTERNATIONAL, LIMITED (hereinafter "NORWICH UNION") breached a contract to name IFAE as an additional insured in an insurance policy issued to DAVID MORRIS

INTERNATIONAL (hereinafter "DMI").  The Plaintiff also alleges that NORWICH UNION failed to defend and indemnify IFAE pursuant to this contract.

### DIVERSITY JURISDICTION

3.    This Court has original jurisdiction of this action under the provisions of 28 U.S.C. §1332 and it is one that may be removed to this Court by Defendant and pursuant to the provisions of 28 U.S.C. §1441(b).  Based upon the allegations of Plaintiff's Complaint, there exists diversity of citizenship and the amount in controversy is in excess of this Court's jurisdiction.  NORWICH UNION states that at all times relevant, including the time of commencement of this action as well as the time of filing the Notice of Removal as well as this Amended Notice, NORWICH UNION was incorporated in the United Kingdom, a foreign country.  NORWICH UNION also states that at all times relevant including at the time of commencement of this action and at the time of filing the Notice of Removal and this Amended Notice of Removal, NORWICH UNION had its principal place of business in Norwich, United Kingdom.  The Plaintiff has alleged that IFAE is a Florida Corporation and that NORWICH UNION is a foreign corporation with its principal place of business, Norwich, United Kingdom.  The Plaintiff further alleges that IFAE is being sued in a case, a copy of the Amended Complaint is an exhibit to the Amended Complaint in this action, by an insurance company for subrogation due to its payment of $2,700,000.  The payment was paid to DMI as a result of a jewelry theft that took place on February 2001. It is for this jewelry theft that Plaintiff maintains in the Amended Complaint that NORWICH UNION owes a duty to defend and indemnify.

4.    The Plaintiff has alleged in the Amended Complaint that DMI has as its principal place of business, London, England.  NORWICH UNION has been authorized by

Mr. David Morris to advise this Court that DMI is a business organized according to the laws of the United Kingdom with its principal place of business being London, United Kingdom, both at the time of commencement of this action as well as at the time of the filing of the Notice of Removal and Amended Notice of Removal.  See Notice of Consent for Removal attached hereto as Exhibit "A" as well as the Amended Notice of Consent for Removal attached hereto as Exhibit "B".  The Plaintiff, at the time of filing the Notice of Removal, Amended Notice of Removal and at the commencement of this action, was a citizen of the state of Florida.  Plaintiff's principal place of business, at the time of filing the Notice of Removal, Amended Notice of Removal and at the commencement of this action, is the state of Florida.  NORWICH UNION and DMI, at the time of filing the Notice of Removal, Amended Notice of Removal and at the commencement of this action, were citizens of the United Kingdom.

5.      Removal is effectuated pursuant to the provisions of 28 U.S.C. §1441, and is timely under the provisions of 28 U.S.C. §1446(b), in that less than thirty (30) days have elapsed since Defendant was served with the Complaint.  NORWICH UNION has been authorized by the principal of DMI, Mr. David Morris to consent on behalf of DMI to this removal as evidenced by Exhibits "A" and "B" to this Amended Notice.

6.      Where no dollar amount of damages has been pled, one of two conditions must be met to find that the amount in controversy meets the jurisdictional requisite.  Either it must be facially apparent that the damages sought likely exceeds $75,000.00, or the defendant must prove be a preponderance of the evidence that the damages sought likely exceed $75,000.00.  See, Cross v Bell Helmets, USA, 927 F.Supp. 209 (ED Texas, 1996).

7.     Plaintiff's allegation of damages as set forth above show this Court that the damages sought against NORWICH UNION are facially in excess of the jurisdictional requirements of this Court.

## OTHER PROCEDURAL REQUIREMENTS

8.     Written notice of the filing of this notice has been furnished to Plaintiff.  A copy of this notice has been filed with the Clerk of the Circuit Court of the Nineteenth Judicial Circuit in and for Martin County, Florida.

9.     Attached is a copy of all process, pleadings and orders served in this action.

WHEREFORE, Defendant NORWICH UNION INSURANCE LIMITED respectfully requests this Court to assume original jurisdiction and grant this Amended Notice of Removal.

Respectfully submitted,

BAZINSKY & KORMAN, P.A.
Attorneys for **NORWICH UNION**
7901 SW 6th Court, Suite 450
Plantation, FL 33324
Tel:    (954) 626-0000
Fax:    (954) 626-0011

MICHAEL W. BAKER
Florida Bar No. 557943

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail on this 14th day of November, 2003, to: Scott S. Warburton, Esquire, Adams, Coogler, Watson, Merkel, Barry & Kellner, P.A., Attorneys for Plaintiff, 1555 Palm Beach Lakes Blvd., Suite 1600, West Palm Beach, FL 33402-2069.

MICHAEL W. BAKER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CIV-GRAHAM**

CASE NO. **03-14309**

**MAGISTRATE JUDGE LYNCH**

IFAE INTERNATIONAL FINE ARTS
EXPOSITIONS, INC., f/k/a LESTER
EXPOSITIONS, INC.,

Upon removal from the Circuit Court of the
Nineteenth Judicial Circuit in and for Martin
County, Florida, Case No. 03-770 CA

      Plaintiff,

vs.

DAVID MORRIS INTERNATIONAL
and NORWICH UNION INSURANCE
LIMITED,

      Defendant.

_____/

FILED BY: _____ D.C.

2003 OCT 22  PM 4:49

CLERK U.S. DIST. CT.
S.D. OF FL.-FTL.

## NOTICE OF CONSENT FOR REMOVAL

      Defendant, DAVID MORRIS INTERNATIONAL, by and through undersigned counsel who appears for the limited purpose of filing this Notice of Consent for Removal, states as follows:

      1.    DAVID MORRIS INTERNATIONAL through its principal David Morris consents to the Notice of Removal filed by the Defendant NORWICH UNION INTERNATIONAL, LTD.

      2.    This is to confirm that DAVID MORRIS INTERNATIONAL is a limited corporation organized according to the laws of the United Kingdom with its principle place of business being London, England, United Kingdom.

## CERTIFICATE OF SERVICE

      WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail on October 22, 2003 to: Scott S. Warburton. Esquire. Adams.



EXHIBIT
A

Coogler, Watson, Merkel, Barry & Kellner, P.A., Attorneys for Plaintiff, P.O. Box 2069,

West Palm Beach, FL 33402-2069.

> BAZINSKY & KORMAN, P.A.
> 7901 SW 6th Court, Suite 450
> Plantation, FL 33324
> Tel:   (954) 626-0000
> Fax:   (954) 626-0011

By _____
      MICHAEL W. BAKER
      Florida Bar No. 557943

NOR-036393

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

IFAE INTERNATIONAL FINE ARTS
EXPOSITIONS. INC., f/k/a LESTER
EXPOSITIONS, INC.,

CASE NO. 03-14309-CIV-GRAHAM
Magistrate Lynch

       Plaintiff,

vs.

DAVID MORRIS INTERNATIONAL
and NORWICH UNION INSURANCE
LIMITED,

       Defendants.
_____/

## AMENDED NOTICE OF CONSENT FOR REMOVAL

Defendant. DAVID MORRIS INTERNATIONAL, by and through undersigned counsel who appears for the limited purpose of filing this Amended Notice of Consent for Removal, states as follows:

1.    DAVID MORRIS INTERNATIONAL through its principal David Morris consents to the Amended Notice of Removal filed by the Defendant NORWICH UNION INTERNATIONAL, LTD.

2.    This is to confirm that DAVID MORRIS INTERNATIONAL is a limited corporation organized according to the laws of the United Kingdom with its principal place of business being London, England, United Kingdom at the time of filing the Notice of Removal and Amended Notice of Removal.

3.    This is to confirm that DAVID MORRIS INTERNATIONAL was a limited corporation organized according to the laws of the United Kingdom with its principal place

EXHIBIT

"B"

of business being London, England, United Kingdom, at the time of the commencement

of this action.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has

been furnished by U.S. Mail on November 14, 2003 to: Scott S. Warburton, Esquire,

Adams, Coogler, Watson, Merkel, Barry & Kellner, P.A., Attorneys for Plaintiff, P.O. Box

2069, West Palm Beach, FL 33402-2069.

> BAZINSKY & KORMAN, P.A.
> 7901 SW 6th Court, Suite 450
> Plantation, FL 33324
> Tel:   (954) 626-0000
> Fax:   (954) 626-0011
>
>
> By_____
>    MICHAEL W. BAKER
>    Florida Bar No. 557943

-2-

IN THE CIRCUIT COURT OF THE
NINETEENTH JUDICIAL CIRCUIT IN
AND FOR MARTIN COUNTY FLORIDA

CASE NO. 03-770-CA

IFAE INTERNATIONAL FINE ARTS
EXPOSITIONS, INC., f/k/a LESTER
EXPOSITIONS, INC.,

      Plaintiff,

vs.

DAVID MORRIS INTERNATIONAL and
NORWICH UNION INSURANCE LIMITED,

      Defendants.

_____/



## AMENDED COMPLAINT

    IFAE INTERNATIONAL FINE ARTS EXPOSITIONS, INC. f/k/a LESTER EXPOSITIONS, INC., by and through the undersigned counsel, sue the Defendants, DAVID MORRIS INTERNATIONAL and NORWICH UNION INSURANCE LIMITED, an alleges:

    1.    This is an action for damages in excess of $15,000.

    2.    At all times relevant to this action, IFAE INTERNATIONAL FINE ARTS EXPOSITIONS, INC. f/k/a LESTER EXPOSITIONS, INC. (hereinafter referred to as "IFAE"), is a Florida corporation with its principal place of business in Martin County, Florida.

    3.    At all times relevant to this action DAVID MORRIS INTERNATIONAL (hereinafter referred to as DMI), was doing business in Florida with its principal place of business in London, England.

ADAMS, COOGLER, WATSON, MERKEL, BARRY & KELLNER, P.A.

4.     At all times relevant to this action, Defendant, NORWICH UNION INSURANCE LIMITED (hereinafter referred to as "NORWICH"), is a foreign corporation with its principal place of business in Norwich, United Kingdom.

**COUNT I**
**BREACH OF CONTRACT AGAINST DAVID MORRIS INTERNATIONAL**

IFAE hereby realleges paragraphs 1 through 4 as fully set forth herein and further alleges as follows:

5.     On or about May 9, 2000, DMI and IFAE entered into a contract whereby DMI leased 661 square feet for a rental price of $52,280 for purposes of exhibiting fine jewels and other goods at the Palm Beach International Art and Antique Fair (a true and correct copy of the contract is attached as Exhibit "A").

6.     Pursuant to paragraph 11 of the above mentioned contract DMI was to carry insurance coverage including commercial general liability, personal injury and blanket contractual liability insurance with limits of at least $500,000 per occurrence. Pursuant to the same paragraph 11 of the above mentioned contract DMI was to name IFAE as an additional insured.

7.     Pursuant to paragraph 10 of the above mentioned contract DMI waived any and all claims against IFAE for loss, theft, damage or destruction by fire, water or otherwise of any artwork, crates, packing materials or other goods on the premises of IFAE at any time.

8.     Pursuant to paragraph 9 of the above mentioned contract 24 hour security guard service was provided to prevent entry into the exhibit area by anyone not authorized, however, the security guard service supplied did not in any way guarantee the exhibitors, including DMI, against

2

loss and did not imply an assumption of liability for exhibitors' property, including the property of DMI, by the premises or show organizers.

9.     At all times relevant to this action DMI owed contractual duties to IFAE to meet the obligations under the above mentioned contract.

10.     DMI breached their contractual duties to IFAE by failing to comply with the insurance requirement, despite agreeing to do so pursuant to paragraph 11 of the above mentioned contract.

11.     As a direct result of DMI's breach of their contractual duties, the insurance company which insured DMI is now suing IFAE for subrogation of DMI's claim for $2.7 million arising from the theft of jewelry during the February 2001 Palm Beach International Art and Antique Fair Exposition. (Attached hereto as Exhibit "B" and incorporated herein is Plaintiff's Amended Complaint in that cause of action.)

WHEREFORE, IFAE demands judgment against DMI for actual and compensatory damages as well as interest and cost, and all the damage that the Court deems just and proper, and further demands trial by jury.

## COUNT II
## INDEMNITY FROM DAVID MORRIS INTERNATIONAL

IFAE hereby realleges paragraphs 1 through 4 as fully set forth herein and further alleges as follows:

12.     Pursuant to paragraph 11 of the contract, DMI expressly agreed to save and hold harmless IFAE, their management, agents and employees from any and all claims, liabilities and losses for injury to persons or damage to property arising in connection with DMI's use of the exhibit space.

3

DMI waived any and all claims against IFAE for loss theft, damage or destruction by fire, water or otherwise for any of its materials on the premises of IFAE at any time.

13.    Consequently, pursuant to paragraph 11 of the contract, DMI has a duty to save, hold harmless, and indemnify IFAE against any and all claims arising from DMI's use of the exhibit space.

WHEREFORE, IFAE demands judgment against DMI for indemnity as well as interest and costs, and all the damage that the Court deems just and proper, and further demands trial by jury.

## COUNT III
## CONTRIBUTION FROM DAVID MORRIS INTERNATIONAL

IFAE hereby realleges and adopts paragraphs 1 through 4 as if fully set forth herein and further alleges as follows:

14.    This is an action for contribution under the Uniform Contribution Amongst Tortfeasors Act, Section 768.38, Florida Statutes, and is within the jurisdiction of this Court.

15.    DMI had a duty to exercise reasonable care in the operation, supervision and management of its exhibition booth located at the Palm Beach International Art and Antique Fair and to perform such acts in a non-negligent manner as to avoid injuries to person and property such as the property in question in this case.

16.    Failed to exercise reasonable care by negligently supervising and managing its booth, and by leaving the keys to the jewelry cases out in the open an unsupervised by any of the booth's attendants or owners.

17.    DMI's negligence was the legal and proximate cause of the theft of the jewelry and any damages suffered by DMI as a result thereof.

4

18.     Consequently, any damages suffered by DMI's insurer were caused in whole or in part by DMI's negligence. As a result of the damages alleged, DMI's insurance company, Those Certain Underwriters at Lloyd's of London Market Insurance Companies subscribing to Policy No. N0020180502-AAFV3586 (Hereinafter referred to as "Lloyds of London"), made a demand for damages against IFAE.

19.     IFAE is entitled to contribution from DMI for its pro rata responsibility of the claims by the underlying Plaintiffs, Lloyd's of London, pursuant to Florida Statute, Section 768.31.

WHEREFORE, IFAE demands judgment in the amount of its damages and asserts its claim for contribution against DMI, together with costs, and further demands trial by jury.

## COUNT IV
## BREACH OF CONTRACT AGAINST NORWICH UNION INSURANCE LIMITED

IFAE hereby realleges paragraphs 1 through 4 as fully set forth herein and further alleges as follows:

20.     At all times relevant to this action, NORWICH was the insurer for DMI, and NORWICH was contracted by DMI to cover its interests pursuant to a contract entered into by DMI and IFAE for DMI's exposition at the Palm Beach International Art and Antique Fair in February 2001.

21.     Pursuant to the contract between DMI and IFAE the Policy of Insurance was to name IFAE as an additional insured and DMI expressly agreed to save and hold harmless IFAE, their management, agents and employees from any and all claims, liabilities and losses for injury to persons or damage or injury to property arising in connection with DMI's use of the exhibit space at the Palm Beach International Art and Antique Fair in February 2001.

5

22.     Pursuant to the Certificate of Insurance NORWICH had a duty to defend and/or indemnify IFAE for any and all liabilities arising in connection with DMI's use of the exhibit space, including the theft of jewelry from DMI

23.     NORWICH has breached this contractual duty and has failed to defend or indemnify IFAE as an additional insured under its Certificate of Insurance.

24.     As a result of NORWICH's breach of its contractual duties IFAE is now being sued for subrogation for DMI's loss of property in connection with its exhibit at the 2001 Palm Beach International Art and Antique Fair.

WHEREFORE, IFAE demands judgment against NORWICH for actual and compensatory damages, interest and costs, court costs and reasonable attorneys' fees incurred by the Plaintiff pursuant to Florida Statute, Section 624.155(3), and all the other damages the court deems just and proper as well as interest and costs, and further demands trial by jury.

> Adams, Coogler, Watson, Merkel, Barry & Kellner, P.A.
> Post Office Box 2069
> 1555 Palm Beach Lakes Blvd., Suite 1600
> West Palm Beach, FL 33402-2069
> (561) 478-4500
> Attorney for Plaintiff

By:_____
     SCOTT S. WARBURTON, ESQUIRE
     Florida Bar # 867268

6

# Palm Beach

**INTERNATIONAL
ART & ANTIQUE
FAIR**

# EXHIBITOR AGREEMENT

## FEBRUARY 1 - 11, 2001

CONTRACT #: __750015-A__

DATE: __May 9, 2000__

This AGREEMENT between

PHONE: __44 171 499 2200__

GALLERY NAME: __David Morris International Ltd__

CONTACT: __Ian Rose__

(hereinafter the "Exhibitor") and IFAE Inc., a Florida corporation (hereinafter "PALM BEACH INTERNATIONAL ART & ANTIQUE FAIR or PBIAAF") shall govern the terms and conditions of the Exhibitor's lease of exhibition space in the PBIAAF Pavilion to be located in West Palm Beach, Florida, plus any additional days required for move-in and move-out. Exhibitor and PBIAAF agree as follows:

1. Exhibitor leases ___661___ square feet for the aforementioned PBIAAF at a total rental price of $ 52280.00, plus applicable state and local taxes, plus service and administrative charges as outlined below, in U.S. currency. This rental price reflects payment by cash, check, or bank wire transfer. Credit card payments are accepted only subject to a 3% surcharge

2. Exhibitor shall have remitted a deposit to be credited toward full payment of the rental price.

3. The balance of the rental price shall be paid by Exhibitor in __3__ equal installments due Aug 1, 2000 , Oct 1, 2000 and on or before Dec 1, 2000 . In the event Exhibitor fails to make such scheduled payments and/or if any payment is delinquent more than 15 days past the due date, the Exhibitor's booth location will be assigned to a non-preferential area and a late charge of $1.00 per square foot service charge will added to each delinquent payment.

4. In the event that Exhibitor fails to make rental payments as agreed herein, Exhibitor shall be deemed in default, and PBIAAF shall have the right to retain Exhibitor's deposit and all monies paid as a non-exclusive remedy thereby reserving any and all other rights under law. In the event of a default by Exhibitor, PBIAAF shall have the right but not the obligation, to lease the subject exhibition space to another exhibitor prior to the exhibition. In the event PBIAAF is unable to lease all available exhibition space, Exhibitor shall remain liable for the full balance due under the terms of this Agreement, all approved catalogue and lighting fees, together with all costs of collection, including but not limited to, all reasonable attorneys' fees, court costs and interest.

5. Service and supplemental charges: Supplemental charges will be required of each exhibitor for booth lighting, wall covering, color catalogue preparation and PBIAAF advertising. Additional services may be requested by the exhibitor and charges thereof are outlined in the Exhibitor Manual. All charges must be paid in full prior to the Exhibitor's entry to the show floor.

6. By execution of this AGREEMENT, Exhibitor acknowledges the Rules & Regulations on reverse side of this AGREEMENT. The Exhibitor promises to abide by the Rules and Regulations contained in this AGREEMENT and such further rules and regulations as may be implemented by PBIAAF and/or its Dealer's Advisory Committee governing the terms of exhibition at PBIAAF.

7. The liability of PBIAAF for failure to perform its obligations under this AGREEMENT is subject to the same conditions and limitations on liability set forth in the "Exhibition Lease" between PBIAAF and its landlord for the exhibition site & building.

8. This AGREEMENT is governed solely by the laws of the State of Florida. In the event of any and all litigation arising from this AGREEMENT, the parties hereby agree that the sole venue for all legal action shall lie exclusively in the appropriate Courts of Martin County, Florida. The parties agree to waive trial by jury in any and all litigation arising from this agreement.

9. This AGREEMENT constitutes the entire contract between the parties. There are no other agreements, oral or written, other than contained herein.

10. This AGREEMENT shall not take effect and there shall be no obligation by either party unless it is countersigned by PBIAAF. It shall be effective on the date countersigned by PBIAAF and such countersignature shall be deemed acceptance of the Exhibitor to PBIAAF.

11. This AGREEMENT is fully or partially assignable at the sole discretion of PBIAAF.

12. In the event that any individual provision of this AGREEMENT shall be deemed invalid by any court of competent jurisdiction, the remaining provisions of this agreement shall remain in full force and effect.

I have read this agreement in its entirety, including the Rules and Regulations on the reverse side, and agree to be bound by the terms and conditions herein.
Name (Please Print) ___DAVID MORRIS___

Authorized Signature _____

Date ___14-5-200 0___

Title ___Chairman___




# Rules & Regulations

1. **General Information:**
Location: Specially constructed temporary pavilion or new permanent exhibition facility in West Palm Beach, Florida.
Exhibition Hours: Exhibition hours subject to change at the discretion of Show Management.

2. **Exhibition Admission:** Exhibitor's application to lease exhibit space at PBIAAF shall not be deemed accepted until PBIAAF has executed a countersigned EXHIBITOR'S AGREEMENT. PBIAAF reserves the right to accept or reject any Exhibitor solely upon its own discretion and for any reason whatsoever. In the event any Exhibitor shall submit false information whatsoever, or attempt to exhibit artwork not specified on the EXHIBITORS' APPLICATION, PBIAAF reserves the right to cancel the EXHIBITOR'S AGREEMENT at any time, and retain any monies paid as liquidated damages. Exhibitors may not assign or sublet all or any of their booth space contracted under the AGREEMENT without written consent of PBIAAF.

3. **Vetting:** PBIAAF is a strictly vetted fair. All applicants agree to abide by the decisions of the Vetting Committee with regard to all proposed exhibitions at PBIAAF.

4. **Cost of Exhibition Services Provided:** The following services are included in Exhibitor's space rental: a standard amount of solid partitions suitable for hanging, standard carpeting, and basic Exhibitor sign.

5. **Other Available Services & Technical Information:** Detailed information such as shipping instructions, customs requirements, warehousing facilities and order forms for additional walls, wall covering, booth trim, furniture, lights, telephones, floral, hotels and other services will be included in the Exhibitors' Manual.

6. **Supplemental and Service Charges:** There are supplemental fees for required booth lighting, wall covering, color catalogue preparation, and PBIAAF advertising. Additional charges may be incurred for the following: extra walls, custom flooring, booth trim, additional signage, furniture, custom drapery, shelving, closets, sculpture pedestals and sculpture drayage. These charges must be paid in full prior to the Exhibitor's entry to the show floor.

7. **General Appearances:** The show shall have an approved look. All walls, wall coverings, floor covering, furniture and lighting must be approved by Show Management.

8. **Co-Exhibitors:** There will be no co-Exhibitors without written approval from PBIAAF. There will be a surcharge for each approved co-exhibitors. Any Exhibitor allowing a co-Exhibitor to participate in his rented space without prior written approval from PBIAAF acknowledges the liability of this surcharge and acknowledges any such unauthorized co-participation voids all rights of the Exhibitor.

9. **Security:** A 24-hour security guard service is provided to prevent entry to exhibit area by anyone not authorized by the Organizer or not wearing proper badges for admission to such areas. The watchman service supplied does not guarantee Exhibitors against loss, neither does it imply an assumption of liability for Exhibitor's property by the premises or show organizers. Merchandise security passes with an authorized signature and/or passes issued by PBIAAF must be utilized. The above is for the protection of all Exhibitors and shall not be construed as any guarantee or indemnification whatsoever to the Exhibitors against loss or theft or otherwise, nor does it imply an assumption of liability by PBIAAF with respect to Exhibitor's property.

10. **Release of Liability:** PBIAAF will not accept any responsibility for the well being of any art and materials consigned to or in the ownership of any Exhibitor during PBIAAF. The Exhibitor waives any and all claims against PBIAAF for loss, theft, damage, or destruction by fire, water or otherwise of any art work, crates, packing materials, etc. on the premises of PBIAAF at any time as well as for injury to himself, his agents, servants and/or employees while in the exhibition premises, and for any damage of any nature including damage to his business by reason of the failure to provide space for his exhibit or for any failure to hold exhibition as scheduled.

11. **Insurance and Release of Liability:** Exhibitors must carry worker's compensation, commercial general liability including products and completed operations, independent contractors, personal injury and blanket contractual liability insurance at limits of at least $500,000 per occurrence and, $500,000 per aggregate. These coverages must be evidenced by a Certificate of Insurance with a 30 day notice of cancellation provision to the holder and naming PBIAAF as additional insured at least 30 days before the proposed exhibit date. It is strongly recommended the Exhibitors also carry insurance to cover loss, damage, or injury to any property of the Exhibitor or to any of his officers, agents, employees or contractors, whether attributable to accident, fire, theft or any other cause whatsoever. While the exhibition may provide security guards, it is done solely as an accommodation to Exhibitors. The Exhibitor expressly agrees to save and hold harmless PBIAAF, their management, agents, and employees from any and all claims, liabilities and losses for injury to persons (including death) or damage to property arising in connection with Exhibitor's use of the exhibit space.

12. **Authenticity:** Should the authenticity of any work of art be placed in issue during the course of the exposition, PBIAAF reserves the right to have said work withdrawn from the exposition at the request of the Vetting Committee and/or the Fair Organizers. All such decisions are at the sole discretion of the Vetting Committee and/or the Fair Organizers. All Exhibitors are strictly accountable for the authenticity of the works of art which are shown or sold at the exposition. The Exhibitor shall indemnify and hold PBIAAF harmless against any claims whatsoever made with regard to the authenticity of any work, with regard to any misrepresentation of any irregularity made with respect to the sale of any artwork at the exposition, as well as any expenses incurred by PBIAAF, including attorney's fees.

13. **Catalogue:** An official catalogue is to be published for PBIAAF. No claims can be entertained with respect to errors or omissions in the catalogue. The Exhibitor shall be responsible for the content of the entries and for any damages claimed through the publication thereof. Each Exhibitor may be restricted to a maximum number of pages in the catalogue. Color catalogue preparation fees may be required from each exhibitor.

14. **Promotional Activities at PBIAAF:** Cinema, video, audio, printed material and posters are not permitted at PBIAAF.

15. **Special Wall Arrangements:** Any alterations in booth structure must be approved in writing by PBIAAF and will be at the expense of the Exhibitor. Request for additional wall partitions, wall coverings or special wall arrangements other than the standard amount furnished shall be submitted to the PBIAAF office no later than the scheduled dates, as outlined in the Exhibitor's Instructional Manual. Additional wall construction and wall coverings will be an additional charge.

16. **Restrictions:** *Signage:* All signage for PBIAAF must be show standard. No Exhibitor will be allowed to mount display or post non-uniform signage without prior written approval. *Furniture:* All furniture must be show standard. No additional furniture, displays, storage units or similar furnishings will be allowed without prior written approval. *Lighting:* All lighting must be show standard and supplied by PBIAAF. No individual lighting systems will be permitted at PBIAAF.

17. **Exposition Cancellations:** Should any contingency prevent the holding of the exhibition, other than from a direct act or omission of PBIAAF, the Organizers may retain such part of Exhibitors' rental as shall be required to recompense it for expenses incurred up to the time such contingency shall have occurred. Both parties will be relieved of any other and all further liability. PBIAAF shall not incur any liability whatsoever in case of event cancellation.

18. **Exhibitor Release and Responsibility:** Exhibitor agrees to indemnify and hold PBIAAF harmless for any claims arising out of negligence of Exhibitor, his agents, or employees. Exhibitor agrees to obtain adequate insurance against any such claims and to produce evidence of such insurance if requested by PBIAAF. Exhibitors must remain with all artwork and/or their freight until the designated shipper has removed same from premises.

19. **General Remarks:** Special Exhibition badges must be worn by Exhibitor staff.
All verbal agreements, individual permits and special arrangements must be confirmed in writing.
No food will be allowed outside the designated eating areas.

# *Palm Beach* INTERNATIONAL ART & ANTIQUE FAIR

# APPENDIX A

## SUPPLEMENTARY RULES AND REGULATIONS

1. Subject to the terms and conditions of the Exhibitor's Agreement between the Palm Beach International Art & Antique Fair (hereinafter referred to as PBIAAF) and the Exhibitor and these rules and regulations, the Exhibitor shall have access to the Exhibition Facility on the dates and during the hours to be designated by PBIAAF; however, this will be no earlier than 10:00 a.m. on Monday, January 29, 2001, and no later than 1:00 p.m. on Monday, February 12, 2001. Additional setup time may be available to exhibitors by prior written agreement.

2. PBIAAF reserves the right to prohibit any exhibit or proposed exhibit and to permit only such artwork and conduct as PBIAAF may approve. This reservation covers all persons, things, conduct, printed matter, advertising, souvenirs, emblems, and all matters which affects or may affect the fair. All printed matter to be distributed by the Exhibitor at the fair must be submitted to PBIAAF for approval prior to such distribution.

3. Except as otherwise set forth herein, PBIAAF shall be responsible for providing to the Exhibitor, free of additional charge, a basic exhibit booth, sufficient in construction and design to permit, in the opinion of PBIAAF, appropriate display of the Exhibitor's exhibit. All exhibit booths must have a ceiling to be installed at the expense of the exhibitor. No exhibit booth may be so high along the front or sides of the exhibit booth as to hide the adjoining or neighboring exhibit from the view of visitors passing along the aisles. All electrical and decorating work will be undertaken, at the Exhibitor's sole cost and expense, by contractors designated by PBIAAF. Details of the electrical and decorating contractors will be forwarded to the Exhibitor upon execution of the standard Exhibitor's Agreement and this Appendix A.

4. PBIAAF will inform the Exhibitor of the official opening and closing hours of the area of the Exhibition Facility in which the Exhibitor's space(s) is (are) located as well as any special rules and regulations pertaining to that area, including without limitation, details concerning the installation, operation and dismantling of the Exhibitor's exhibition. The Exhibitor agrees to comply with all existing rules and regulations without reservation or appeal.

5. All of the Exhibitor's exhibits must be delivered to the Exhibition Facility and set up on the dates and at the times to be designated by PBIAAF. The Exhibitor's exhibits must be set up and ready for vetting prior to the date and time to be designated by PBIAAF. The Exhibitor may not use a non-exhibiting dealer or any of its employees, representatives or agents, to assist in setting up the Exhibitor's exhibits.

6. Each Exhibitor is responsible for obtaining its own insurance coverage. PBIAAF disclaims any responsibility or liability for any loss or damage to person or property in connection with the fair. All exhibits and other property brought into the Exhibition Facility by the Exhibitor shall be at the sole risk of the Exhibitor. The Exhibitor, his employees, agents, and assigns hereby unconditionally release PBIAAF from any responsibility whatsoever for any loss or damage to person or property in connection with the fair.

7. The Exhibitor is entirely responsible for the exhibit space(s) and agrees to reimburse PBIAAF for any damage to the floor, walls or equipment used in connection with the exhibit space(s). The Exhibitor shall not drive nails into, gouge, scrape, paint, place tape upon or in any way mar or mark the surface of the floor.

8. The Exhibitor must make written application to PBIAAF for security passes to be issued to the Exhibitor and its employees, representatives, and agents necessary to set up and/or dismantle the Exhibitor's exhibits. All such individuals must report to the Exhibitor Services office or designated Security Office on arrival at the Exhibition Facility. Such security passes shall be valid on the dates and during the times to be designated by PBIAAF. All such security passes shall become void at the time specified by PBIAAF for the completion of such set up and/or dismantling of the fair.

9. The Exhibitor must make written application to PBIAAF for security passes to be issued to the Exhibitor and its employees, representatives and agents necessary for the efficient operation of the Exhibitor's exhibit. Such security passes shall be valid on the dates and during the times to be designated by PBIAAF, including without limitation during the opening and closing hours of the fair, must be retained by such individuals at all times during the Show and must be presented to the Exhibition Facility security officers upon request.

10. PBIAAF will provide 24-hour perimeter security services from 10:00 a.m. Monday, January 29, 2001 to 1:00 p.m. Monday, February 12, 2001, but shall assume no responsibility whatsoever for any loss or damage to the property of the Exhibitor. The Exhibitor may, at its own cost and expense, arrange through an independent security company for its own security service.

11. All activities of the Exhibitor must be confined within the exhibit space(s) and conducted as consistent with a major vetted, first-quality international art and antique fair. Sound-producing devices and/or sound amplification equipment may not be installed or operated, without the express authorization of fair organizers.

12. The Exhibitor, at its sole cost and expense, must keep the exhibit space(s) at all times properly presented and maintained consistent with first-quality presentation at all times. In addition, the Exhibitor must remove all packing crates and debris from the exhibit space(s), no later than the date and time designated by PBIAAF. Exhibitors should clean the exhibit space(s), and remove all exhibit coverings and dust the exhibits at least one hour before the Exhibition Hall is open to the public each day.

13. PBIAAF and its employees, representatives and agents may at all times enter upon, pass over, through, and/or across the exhibit space(s) for any reason whatsoever, including without limitation, for the purpose of gaining access to or doing any work on any other part of the Exhibition Facility or the fair.

14. No refreshments or liquor of any kind may be supplied or stored in the Exhibition Hall by the Exhibitor, without prior approval. Smoking is not allowed in the Exhibition Facility by state law.

15. The Exhibitor's exhibit shall be presented and the privileges granted under the Exhibitor's Agreement and Appendix A shall be exercised in strict conformity with all applicable federal, state and local laws, rules and regulations. In addition, the Exhibitor shall keep at all times all entrances, exits, gangways, passages, stairways, corridors and floor space and other areas used by the public free of all obstructions and respect all fire laws and codes.

16. The Exhibitor shall be responsible for obtaining any necessary licenses or permits, and for the payment of all taxes imposed by any taxing authority in connection with the rental of space, decoration thereof, use thereof, and/or sales therein, as well as any other activities in conjunction with participation in the fair subject to the Exhibitor's Agreement and Appendix A thereof.

17. PBIAAF shall appoint various Vetting Committees with respect to the different categories of exhibits to be exhibited at the Fair. The appropriate Vetting Committee shall run the right to request the examination of any exhibit for any reason at any time. All work hereto PBIAAF Fair and

18. All exhibits must be properly attributed and be ___ and of such a standard and in such condition, taking ___ count its age and importance that its exhibition not be contrary to the best interests of the Show ___ whole. The Vetting Committee may refuse objects which ___ e not deemed to be show worthy, including o that are not necessarily fake, but are not felt to be of sufficient quality for the fair.

The appropriate Vetting Committee shall take into account that the statements concerning attribution and condition shall not be such as might be misleading. The following standards must be adhered to by the Exhibitor:

EACH AND EVERY ITEM EXHIBITED MUST HAVE A DESCRIPTIVE LABEL STATING THE NAME OF THE ARTIST, MEDIUM OF THE WORK, DATE OF EXECUTION, COUNTRY OF ORIGIN, AND PROVENANCE. Each and every item must be labeled PRIOR TO the beginning of the Vetting process; exhibitor's failure to label appropriately will lead to the removal of the objects concerned, or the closure of the exhibit space for the duration of the fair. The si the label shall be in keeping with the exhibit.

(a) The dateline for the fair is that 75% of those modern paintings shown by each Exhibitor must have been executed no later than 1950 and all modern paintings have been executed prior to 1970 unless an exemption has been made in advance by the Vetting Committee and/or Fair Organizers. Further, in all categories, all ex it articles should relate to the period they apparently represent, and later copies or pastiche will only be allowed at the discretion of the appropriate Vetting Commi
(b) Antiques or works of art with which the appropriate Vetting Committee is satisfied must be:
i. antiques or works of art of the period which they are represented to be;
ii. in their original form;
iii. must be at least 100 years old to be labeled antiques.
(c) Regilding of mirror frames, gilt chairs and other furniture may be permitted at the discretion of the appropriate Vetting Committee provided that such regild does not include evidence of antiquity, and that the object is labeled as such.
(d) A major restoration is not permitted and the decision of what constitutes a major or minor restoration will be determined solely by the appropriate Vet Committee;
(e) Reductions, including prints or maps with trimmed tops and side margins are not allowed;
(f) Each exhibit must be labeled with the date and country of origin.
(g) No exhibit shall be permitted to include the following under any circumstances:
i. Any exhibit having been so restored as to exclude evidence of serious or extensive damage;
ii. Marriages of any kind; that is items, made of two or more individual sections each of which originally formed part of other different items;
iii. Any exhibit having additions, subtractions later enrichments, or any alterations which change its original character or enhance its value; and,
iv. Items which are, in the opinion of the appropriate Vetting Committee, other than in the best interests of the Fair. For example, (but without limitation):
. Reductions in depth or size generally of any pieces such as sideboards or tables;
. Plain pieces which have been carved, inlaid or cross-banded at a later date;
. Mirrors with original designs altered or with decorated glass borders or panels which are not as the original;
. Gilt gesso tables with new gesso tops;
. Furniture with a solid plinth altered to bracket feet or bracket feet replaced by plinth;
. Blind, wooden doors altered to glass or wire cage;
. Painted furniture repainted with embellishments or a change of color;
. Settees and chairs which originally had cane seats but are now upholstered;
. Clocks in which the original movements have been entirely replaced;
. Prints or maps in which the pictorial surface has been reduced or has modern coloring.
(h) Furniture: The dateline for all antique furniture is 1900.
19th century furniture of exceptional merit created in the style of an earlier period is permissible, providing that it is correctly labeled as such, and providing that the items are not direct copies of an earlier period. 20th century copies of an earlier period are not permissible.
(i) Sculpture: The dateline for the fair is that 75% of sculptures shown by each Exhibitor must have been cast no later than 1950 and all sculpture must have been cas prior to 1970 unless an exemption has been made in advance by the Vetting Committee and/or Fair Organizers. All bronzes must be dated with both the original con ception of the model and the date of the casting offered for sale. If a precise date of a casting is unknown, the gallery must provide a circa date. In the Palm Beac International Art & Antique Fair, no posthumous castings of sculpture are permitted, unless specifically authorized by the artist during his or her lifetime. Reference documents must be supplied.
(j) Paintings, drawings, prints, sculptures, and textiles must bear a label clearly stating the name of the artist with his or her dates or the date of his or her exhibit. I the artist is unknown, the school and approximate date must be stated, e.g. "English School, latter half of 18th century."
(k) Works of deceptive origin must be properly labeled; Any exhibit made in a later period than its general style suggests shall be labeled to indicate its approximate date.

19. Any and all requests for exceptions to the above rules and regulations pertaining to the Vetting guidelines must be submitted in writing to the organizers of the Palm Beach International Art & Antique Fair 30 days prior to setup. Such written requests do not serve as guaranteed exceptions or waivers of the rules herein.

20. In the event that the Vetting Committee determines an exhibited object or objects to be inconsistent with show standards, the Exhibitor will have the object removed and stored at his own expense, outside of the Exhibition Facility.

21. The Exhibitor shall furnish the exhibit space(s) with a sufficient display of exhibits and shall ensure that its employees, representatives and agents are in atten- dance on or at every exhibit space occupied by the Exhibitor at all times during the hours that the Show is open to the public.

22. A Merchandise Security Pass must accompany each article sold by the Exhibitor and must be shown to the Exhibition Hall security officer on leaving the Exhibition Hall. Sufficient Merchandise Security Passes will be given to each Exhibitor by PBIAAF during setup.

23. Each and every exhibit and all boxes, packing material and debris of whatsoever nature used in connection with the Exhibit Space(s) must be removed from the Exhibition Facility and grounds by the Exhibitor, at his/her own cost and expense, not later than the date and time to be designated by PBIAAF. In the event of the Exhibitor's failure to vacate said premises as herein provided, PBIAAF may and is hereby authorized and made the agent of the Exhibitor to remove and store the exhibit and all other materials of any nature whatsoever and shall reimburse PBIAAF for expenses thus incurred.

24. PBIAAF may amend these and any further rules and regulations relating to the fair or adopt additional rules and regulations as may be deemed or desirable neces- sary by PBIAAF at its sole discretion. Failure of PBIAAF to insist in any one or more instances upon the observance and/or performance of any of these rules and regulations shall not constitute a waiver of any subsequent breach of such rules and regulations or the requirement for the Exhibitor to strictly observe any rule or reg- ulation promulgated in the past or future.

revised 1/20/00

AGREED: _____    _____
                                    Authorized Signature

DATE: _____

# IFAE

**Exhibitors Manual**

# Shipment Handling Authorization & Release and Limit of Responsibility

## Drayage Services

The Exhibitor hereby authorizes Palm Beach Int'l Art & Antique Fair to handle the Exhibitor's shipment(s) in accordance with the terms and conditions set forth herein and in the "Limits of Liability" section of this form.

The Exhibitor expressly agrees to Palm Beach Int'l Art & Antique Fair limitations of liability and responsibility as set forth herein. The Exhibitor hereby expressly agrees that Palm Beach Int'l Art & Antique Fair liability, if any, not withstanding other releases of liability contained in the Exhibitor's Agreement, shall be limited to any loss or damage which results solely from Palm Beach Int'l Art & Antique Fair negligence in the actual physical handling of the Exhibitor's artwork or shipment and not for any other type of loss or damage, actual or consequential.

The Exhibitor agrees in connection with the receipt, handling, storage, and reloading of the Exhibitor's artwork and packing materials at the exhibition site that Palm Beach Int'l Art & Antique Fair will provide its services only as the Exhibitor's agent and not as bailee or shipper. If any employee of Palm Beach Int'l Art & Antique Fair shall sign a delivery receipt, bill of lading, or other documents, the Exhibitor agrees that Palm Beach Int'l Art & Antique Fair will do so only as the Exhibitor's agent. The Exhibitor hereby authorizes Palm Beach Int'l Art & Antique Fair to sign for shipments on the Exhibitor's behalf and accepts the responsibility for Palm Beach Int'l Art & Antique Fair signing on the Exhibitor's behalf.

Relative to inbound shipments, consistent with trade show industry practices, there may be a lapse of time between the delivery of Exhibitor shipment(s) to the booth and the arrival of the Exhibitor or his representative. During such time the shipment will be left unattended in the Exhibitor's booth. Palm Beach Int'l Art & Antique Fair will not be responsible for loss, damage, theft, disappearance of Exhibitor's materials after the same has been delivered to show site. Palm Beach Int'l Art & Antique Fair highly recommends the retainment of security services to be in attendance for art left in the Exhibitor's booth in the Exhibitor's absence prior to or during set up.

Relative to outgoing shipments after the show, consistent with trade show industry practices, the Exhibitor recognizes that there may be a lapse of time between the Exhibitor's completion of packing and the actual pick-up of the Exhibitor's shipment from the Exhibitor's booth for loading by a carrier. During such time, the Exhibitor's shipment will be left unattended in the Exhibitor's booth. The Exhibitor agrees that Palm Beach Int'l Art & Antique Fair shall not be responsible for any loss or damage during such period. The Exhibitor understands that Palm Beach Int'l Art & Antique Fair recommends that Exhibitors physically stay with their shipments until removal by their carrier and/or employ a private security service to remain with such shipment(s) on the Exhibitor's behalf.

Absent the physical presence of the Exhibitor or a designee at the time of removal of Exhibitor's shipment by a carrier, the Exhibitor authorizes Palm Beach Int'l Art & Antique Fair to adjust the quantities of items on any bill of lading left with Palm Beach International Art & Antique Fair to conform to the actual count of such items in the booth at the time of pick-up.

In order to expedite removal of materials, Palm Beach Int'l Art & Antique Fair shall have authority to change designated carriers, if such carriers do not pick up on time. Where no disposition is made, materials will be sent to a third party warehouse at Exhibitor's expense, awaiting Exhibitor's shipping instructions. All charges must be paid before release of goods.

### Limits of Liability

1. Palm Beach Int'l Art & Antique Fair shall not be responsible for damage to uncrated materials, materials improperly packaged, or concealed damage.

2. Palm Beach Int'l Art & Antique Fair shall not be responsible for loss, theft, or disappearance of materials after same has been delivered to Exhibitor's booth.

3. Palm Beach Int'l Art & Antique Fair shall not be responsible for loss, theft, or disappearance of artwork, materials, or shipments before they are picked up from Exhibitor's booth for reloading after the show. In the absence of the Exhibitor or his designated agent, Bill(s) of Lading covering outgoing shipments, which are furnished by shippers to Exhibitors, may be checked at time of actual pick-up from booth and corrections made where discrepancies occur.

4. Palm Beach Int'l Art & Antique Fair shall not be responsible for any loss, damage, or delay due to acts of God, strikes, lockouts or work stoppages of any kind.

5. In the event that Palm Beach Int'l Art & Antique Fair shall be deemed to have any liability whatsoever for loss or damage to Exhibitors shipment, Palm Beach Int'l Art & Antique Fair's liability shall be limited to the physical loss or damage to the specific article which is lost or damaged, and in any event Palm Beach Int'l Art & Antique Fairs' maximum liability shall be limited to $.50 per pound per article with a maximum liability of $50.00 per item, or $1,000.00 per shipment, whichever is less.

6. Palm Beach Int'l Art & Antique Fair shall not be liable to any extent whatsoever for any actual, potential, or assumed loss of profits or revenues, or for any collateral costs, which may result from any loss or damage in an Exhibitor's materials which may make it impossible or impractical to exhibit same.

7. The consignment or delivery of a shipment to Palm Beach Int'l Art & Antique Fair by an Exhibitor, or by any shipper to or on behalf of the Exhibitor, shall be consigned as an acceptance by such Exhibitor (and/or shipper) of the terms and conditions set forth herein.

DAVID MORRIS
Name of Gallery

IAN ROSE

Ian Rose
Authorized Signature

26 · 01 · 01
Date

This form must be executed and received by Palm Beach International Art & Antique Fair prior to receipt of freight.

IN THE CIRCUIT COURT OF THE
19th JUDICIAL CIRCUIT, IN AND
FOR MARTIN COUNTY,
FLORIDA

CASE NO. 02-471-CA

THOSE CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON AND LONDON
MARKET INSURANCE COMPANIES
SUBSCRIBING TO POLICY NO. N0020180
502-AAFV3586



Plaintiffs,

vs.

IFAE, INC. and
METROPOL SECURITY, INC.

Defendants

## AMENDED COMPLAINT

Those Certain Underwriters at Lloyd's, London and London Market Insurance

Companies subscribing to Policy No. N0020180 502-AAFV3586 (collectively

"Underwriters"), by and through the undersigned attorneys, sue the defendants, IFAE,

Inc. and Metropol Security, Inc., and allege:

## NATURE OF ACTION

1     This is a civil action for subrogation in respect of a jewelry theft loss

suffered by Underwriters' insured, David Morris International ("DMI"). DMI was the

owner, consignee and insured of the stolen jewelry. The theft occurred at the 2001 Palm

Beach International Art & Antique Fair organized by IFAE, Inc. (collectively

"PBIAAF") in February 2001. DMI was an exhibitor at the fair, having entered into a

contract with PBIAAF for the lease of exhibition space. A true and correct copy of the

contract (the "Agreement") is attached hereto as Exhibit "A." Defendant Metropol
Security Inc. ("Metropol") was under contract with PBIAAF to provide security at the
fair  Underwriters insured the jewelry, and paid DMI approximately US$2,700,000.00 on
account of a claim for the theft under insurance policy no. N0020180 502-AAFV3586
(the "Policy")  A true and correct copy of the acceptance form signed by DMI
acknowledging receipt of this payment and satisfaction of its claim under the Policy is
attached as Exhibit "B "  Underwriters are entitled to maintain this action on their own
behalf and as agent and trustee on behalf of all parties who may be interested in the
jewelry as their respective interests may ultimately appear

## CITIZENSHIP OF THE PARTIES

2      Underwriters are foreign insurers, syndicates and companies who maintain
their principal place of business in London, England.

3.      Underwriters are informed and believe that IFAE, Inc. is or was a Florida
corporation with its principal place of business in Palm Beach County, Florida.

4.      Underwriters are informed and believe that Metropol is a Florida
corporation with its principal place of business in Broward County, Florida.

## JURISDICTION AND VENUE

5.      This is a civil action for damages in excess of $15,000.00 and is within
this Honorable Court's subject matter jurisdiction.  Venue in this county is proper
according to the terms of a forum selection clause in the Agreement

## THE LOSS

6      The fair was held between February 1 and 11, 2001 in a pavilion located
in West Palm Beach, Florida  DMI was assigned Booth 460 inside the pavilion.

7.     PBIAAF arranged security for the protection of exhibitors at the fair, including DMI, through a contract with Metropol.  DMI was one of the persons for whose benefit the contract between PBIAAF and Metropol contract was made.  The purpose and object of the protection contract was to protect the insured from theft.  DMI occupied the status of a third-party beneficiary of the security contract.

8.     In connection with the protection contract, each of the defendants assumed a duty (gratuitously or for consideration) to protect DMI by posting security guards and/or installing surveillance cameras.  Defendant IFAE with the assistance of Metropol promoted the cameras as protection of the exhibitors, including DMI.

9.     In entering into the contract with PBIAAF, Metropol voluntarily assumed a duty towards PBIAAF and DMI to exercise reasonable care and caution in the installation, maintenance, repair, service, monitoring, and operation of the surveillance cameras.

10.    The defendants wanted the exhibitors, including DMI, to believe that security at the pavilion would be better than it actually was.  Before the subject theft, David Lester of IFAE featured the new camera system to exhibitors, including DMI.  Prior to the exhibitors' walk-thru of the security booth, Lester had a Metropol employee sit in front of a CCTV monitor and appear to be monitoring the area shown on the screen to create a false sense of security, even though it was never envisaged that the guards would monitor the screen, but only that videotapes would be made.  The monitor was not manned even though Defendants made it appear to exhibitors, including DMI, that Metropol was hired to monitor the area where the exhibitors maintained their booths,

including the booth of DMI  The video, as it turned out, was neither monitored or regularly checked, sometimes after tapes had run out, and sometimes was not turned on.

11.    Lester told the exhibitors during the walk-thru that some of the cameras were aimed at the booths.  A camera was aimed down the aisle of the DMI booth.

12.    The provision of cameras inside the pavilion was tantamount to a representation to DMI either that its booth was under the protection of the defendants or that the defendants had deemed the booth to be adequately secured.

13.    On or about February 11, 2001 one or more thieves gained access to a DMI display case at Booth 460 and made off with five (5) diamond rings with a total value of approximately US$2,700,000.

14    The theft was reported to Metropol, which contacted the West Palm Beach Police Department.  Richard Carte of Metropol also had an angry conversation with Lester about his (Lester's) having left DMI and the other exhibitors with the false sense that their booths were protected.  Lester simply dismissed Carte's comments, suggesting the theft was DMI's problem, not IFAE's.

15.    The placement and operation of the security cameras at the fair was causally related to the loss in that:

     a)    The video cameras were installed to identify persons for reasons of security for the protection of exhibitors including DMI;

     b)    The video cameras were relied on by exhibitors including DMI to provide security protection at the pavilion;

     c)    The cameras were ineffective for making any type of identification of person at the booths, including the DMI booth;

d)      The cameras were positioned too far from the DMI booth to identify anyone;

e)      No guard was stationed at the CCTV monitor as represented to exhibitors, including DMI;

f)      The cameras were otherwise defective, inadequate or incorrectly positioned to account for the amount of pedestrian traffic in the aisles of the pavilion, and around the booths, including the DMI booth.

16.     The resulting loss was within the scope of the danger or risk forseeably created by the defendants' negligence. The instant theft would not have occurred or would not have resulted in DMI's loss, but for the defendants' acts or omissions.  Proper security devices or techniques, had they been implemented, would have reduced the risk of harm suffered by DMI.

17.     This was the second incident at the same exhibition.  Prior the subject incident, a $100,000 ruby and diamond necklace was reported missing from a display case of another exhibitor inside the pavilion occurred on February 4, 2001. Notwithstanding notice of this prior incident, which at the time was thought to have been due to theft, the defendants failed to take adequate precautions to protect the exhibitors and their booths, including DMI, from the risk of theft.

18.     DMI subsequently made a claim under the Policy for the instant theft loss, which Underwriters paid in the approximate amount of US$2,700,000.

## PBIA AF'S AGREEMENT WITH DMI

19      The Agreement contains a Florida choice of law and jurisdiction clause

20.     The Agreement does not provide expressly for the posting of security cameras, but rather refers only to the provision of security guards and badges to prevent entry to the exhibit area by unauthorized persons

21.     The exculpatory language referring to guards and badges is inapplicable in this case because PBIAAF and Metropol undertook to post cameras gratuitously, and as such were obligated to discharge that duty non-negligently.

22      Underwriters alternatively allege that PBIAAF, by its own choice of language in the Agreement it prepared, agreed to take reasonable precautions to assure DMI's protection  Exculpatory language in the Agreement is legally insufficient to absolve PBIAAF and its agents of liability for their own negligence in that the words used do not clearly and specifically indicate an intention to free the defendants from liability for their own negligence  Portions of the Agreement recite that security is provided as an accommodation to exhibitors and for their protection.  Other portions of the Agreement then purport to absolve PBIAAF from liability associated with its undertaking.  Far from unequivocally informing DMI that it was releasing PBIAAF from liability for losses arising from its or Metropol's negligence, a reasonable interpretation of these provisions convey a very different meaning, i.e., that the language only encompasses those losses occurring without their negligence.  The duty to undertake reasonable care expressed in parts of the Agreement would be rendered meaningless if the exculpatory language absolved PBIAAF and its agents from liability for negligence

23      Even if the Agreement absolves PBIAAF and its agents of liability for their own negligence (which it does not), the Agreement strictly construed only relates to the provision of the guards and badges  There is nothing in the Agreement providing

absolution from liability for losses due to material misrepresentations or negligent performance of gratuitous or other undertakings.

### COUNT 1   BREACH OF CONTRACT (against all Defendants)

24.     Underwriters repeat and incorporate by reference the allegations of paragraphs 1 through 23 as though fully set forth herein.

25.     At all times relevant, PBIAAF and Metropol owed contractual duties to DMI to meet their obligations under the Agreement and the protection contract

26     Each of the defendants breached their contractual duties to DMI by failing to provide proper safeguards against theft (including better camera coverage), despite their knowledge of an earlier event involving a suspected theft at the same exhibition.

27.     As a direct result of the defendants' breaches of their contractual duties, DMI suffered loss which Underwriters were obliged to satisfy under the Policy.

WHEREFORE, Plaintiffs demand judgment against the defendants for actual and compensatory damages, as well as interest and costs, and all other damages the Court deems just and proper

### COUNT 2·  NEGLIGENCE (against all Defendants)

28.     Underwriters repeat and incorporate by reference the allegations of paragraphs 1 through 23 as though fully set forth herein.

29     By this action, Underwriters seek damages for the loss of property (i.e the jewelry) other than for harm to consumer expectations regarding the cameras function.

30.     At all times relevant, PBIAAF and Metropol owed exhibitors including DMI a duty to exercise reasonable care and caution in the installation, maintenance, repair, service, monitoring, and operation of the surveillance cameras.

31.    The defendants further breached their duties to DMI by failing to provide proper safeguards against theft (including better camera coverage), despite their knowledge of an earlier event involving a suspected theft at the same exhibition.

32.    Defendants' negligence was the proximate cause of DMI's (and Underwriters') loss as a matter of law. The threat of theft was within the zone of risk created by Metropol and PBIAAF's negligent procedures in posting and maintenance of the security cameras.

33.    As a direct result of the defendants' negligence DMI suffered loss for which Underwriters were obliged to satisfy under the Policy.

WHEREFORE, Plaintiffs demand judgment against the defendants, jointly and severally, for actual and compensatory damages, as well as interest and costs, and all other damages the Court deems just and proper.

COUNT 3: MATERIAL MISREPRESENTATION (against all Defendants)

34.    Underwriters repeat and incorporate by reference the allegations of paragraphs 1 through 23 as though fully set forth herein.

35.    At all times relevant, PBIAAF and Metropol owed exhibitors including DMI a duty to exercise reasonable care and caution in the installation, maintenance, repair, service, monitoring, and operation of the surveillance cameras.

36.    The defendants breached their duties to DMI by representing to exhibitors, including DMI, that the camera system was elaborate and provided protection to their booths.

37.     The provision of cameras inside the pavilion was tantamount to a representation to DMI by the defendants that DMI's booth was under the protection of Metropol or that Metropol had deemed the booth to be adequately secured.

38.     The defendants knew or should have known their representations that the video cameras would provide adequate security were untrue.

39.     The defendants intended that DMI rely on these material misrepresentations as, at no time prior to the loss, did the defendants ever advise DMI that the cameras were posted simply to monitor ingress and egress to the pavilion and not to provide protection for its booth.

40.     DMI justifiably relied upon this reasonable belief that the booth assigned to it was under the protection of Metropol or that Metropol had deemed the booth to be adequately secured. It was also sufficient to create the duty to the insured for PBIAAF to have relied upon the undertaking by Metropol.

41.     As a result of DMI's justifiable reliance upon the defendants' material misrepresentations, DMI suffered loss for which Underwriters were obliged to satisfy under the Policy.

WHEREFORE, Plaintiffs demand judgment against the defendant, jointly and severally, for actual and compensatory damages, as well as interest and costs, and all other damages the Court deems just and proper.

Dated this 30th day of June 2003.

Respectfully submitted,

RUMRELL, COSTABEL, WARRINGTON,
THOMAS & BROCK, LLP

By: _____
Richard G. Rumrell
Florida Bar No.: 132410
Lindsey C. Brock III
Florida Bar No.: 971669
Alfred C. Warrington V
Florida Bar No.: 572111
4500 Salisbury Road, North
Butler Pointe Building, Suite 340
Jacksonville, FL 32216
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a copy of the foregoing has been provided to Scott
S. Warburton, Esquire, Adams, Coogler, Watson, Merkel, Barry & Kellner, P.A.,
Attorney for Defendants, IFAE International Fine Arts Expositions, Inc., n/k/a Lester
Expositions, Inc., P. O. Box 2069, 1555 Palm Beach Lakes Blvd., Suite 1600, West Palm
Beach, FL 33402-2069 and to Christopher Hopkins, Esquire, Attorney for Metropol, 222
Lakeview Avenue, Esperante-Suite 1650, West Palm Beach, FL 33401, by facsimile and
U. S. Mail this June 30, 2003.

_____
Attorney

Jun 30 03 09:54a        Alfred C. Warrington V        904-462-0836        p.2



CONTRACT # 750015-A                              DATE May 9, 2000

This AGREEMENT between                           PHONE 44 171 499 2200

GALLERY NAME David Morris International Ltd       CONTACT Ian Rose

(hereinafter the "Exhibitor") and IFAE Inc., a Florida corporation (hereinafter "PALM BEACH INTERNATIONAL ART & ANTIQUE FAIR or PBIAAF") shall govern the terms and conditions of the Exhibitor's lease of exhibition space in the PBIAAF Pavilion to be located in West Palm Beach, Florida, plus any additional days required for move-in and move-out.  Exhibitor and PBIAAF agree as follows:

1. Exhibitor leases   661   square feet for the aforementioned booth rental at a total rental price of $ 52280.00 plus applicable state and local taxes, plus service and administrative charges as outlined below, in U.S. currency. This rental price reflects payment by cash, check, or bank wire transfer. Credit card payments are accepted only subject to a 3% surcharge.

2. Exhibitor shall have remitted a deposit to be credited toward full payment of the rental price.

3. The balance of the rental price shall be paid by Exhibitor in   3   equal installments due Aug 1, 2000 , Oct 1, 2000 and on or before Dec 1, 2000 . In the event Exhibitor fails to make such scheduled payments and/or if any payment is delinquent more than 15 days past the due date, the Exhibitor's booth location will be assigned to a non-preferential area and a late charge of $1.00 per square foot service charge will added to each delinquent payment.

4. In the event that Exhibitor fails to make rental payments as agreed herein, Exhibitor shall be deemed in default, and PBIAAF shall have the right to retain Exhibitor's deposit and all monies paid as a non-exclusive remedy thereby reserving any and all other rights under law. In the event of a default by Exhibitor, PBIAAF shall have the right, but not the obligation, to lease the subject exhibition space to another exhibitor prior to the exhibition. In the event PBIAAF is unable to lease all available exhibition space, Exhibitor shall remain liable for the full balance due under the terms of this Agreement, all approved catalogue and lighting fees, together with all costs of collection, including but not limited to, all reasonable attorney's fees, court costs and interest.

5. Service and supplemental charges: Supplemental charges will be required of each exhibitor for booth lighting, wall covering, color catalogue preparation and PBIAAF advertising. Additional services may be requested by the exhibitor and charges thereof are outlined in the Exhibitor Manual. All charges must be paid in full prior to the Exhibitor's entry to the show floor.

6. By execution of this AGREEMENT, Exhibitor acknowledges the Rules & Regulations on reverse side of this AGREEMENT. The Exhibitor promises to abide by the Rules and Regulations contained in this AGREEMENT and such further rules and regulations as may be implemented by PBIAAF and/or its Dealer's Advisory Committee governing the terms of exhibition at PBIAAF.

7. The liability of PBIAAF for failure to perform its obligation under this AGREEMENT is subject to the same conditions and limitations on liability set forth in the "Exhibition Lease" between PBIAAF and its landlord for the exhibition site & building.

8. This AGREEMENT is governed solely by the laws of the State of Florida. In the event of any and all litigation arising from this AGREEMENT, the parties hereby agree that the sole venue for all legal action shall lie exclusively in the appropriate Courts of Martin County, Florida. The parties agree to waive trial by jury in any and all litigation arising from this agreement.

9. This AGREEMENT constitutes the entire contract between the parties.  There are no other agreements oral or written, other than contained herein.

10. This AGREEMENT shall not take effect and there shall be no obligation by either party unless it is countersigned by PBIAAF. It shall be effective on the date countersigned by PBIAAF and such countersignature shall be deemed acceptance of the Exhibitor to PBIAAF.

11. This AGREEMENT is fully or partially assignable at the sole discretion of PBIAAF.

12. In the event that any individual provision of this AGREEMENT shall be deemed invalid by any court of competent jurisdiction, the remaining provisions of this agreement shall remain in full force and effect.

I have read this agreement in its entirety, including the Rules and Regulations on the reverse side, and agree to be bound by the terms and conditions herein.

Name (Please Print) DAVID MORRIS

Authorized Signature                             Date

Jun 30 03 09:55a      Alfred C. Warrington V        904-462-0836        p.3
Jan 03 03 09:35a      EGH FL GILANTA GRB ...        770-458-2673        P.5



## Rules & Regulations



1. **General Information:**
Location: Specially constructed temporary pavilion or new permanent exhibition facility in West Palm Beach, Florida.
Exhibition hours: Exhibition hours subject to change at the discretion of Show Management.

2. **Exhibitor Admission:** Exhibitor's application to lease exhibit space at PBIAAF shall not be deemed accepted until PBIAAF has executed a countersigned EXHIBITOR'S AGREEMENT. PBIAAF reserves the right to accept or reject any Exhibitor solely upon its own discretion and for any reason whatsoever. In the event any Exhibitor shall submit false information whatsoever, or attempt to exhibit artwork not specified on the EXHIBITORS' APPLICATION, PBIAAF reserves the right to cancel the EXHIBITOR'S AGREEMENT at any time, and retain any monies paid as liquidated damages. Exhibitors may not assign or sublet all or any of their booth space contracted under the AGREEMENT without written consent of PBIAAF.

3. **Vetting:** PBIAAF is a strictly vetted fair. All applicants agree to abide by the decisions of the Vetting Committee with regard to all proposed exhibitions at PBIAAF.

4. **Cost of Exhibition Services Provided:** The following services are included in Exhibitor's space rental: a standard amount of solid partitions suitable for hanging, standard carpeting, and basic Exhibitor sign.

5. **Other Available Services & Technical Information:** Detailed information such as shipping instructions, customs requirements, warehousing facilities and order forms for additional walls, wall covering, booth trim, furniture, lights, telephones, floral, hotel and other services will be included in the Exhibitors' Manual.

6. **Supplemental and Service Charges:** There are supplemental fees for required booth lighting, wall covering, color catalogue preparation, and PBIAAF advertising. Additional charges may be incurred for the following: extra walls, custom flooring, booth trim, additional signage, furniture, custom drapery, shelving, closets, sculpture pedestals and sculpture drayage. These charges must be paid in full prior to the Exhibitor's entry to the show floor.

7. **General Appearances:** The show shall have an approved look. All walls, wall coverings, floor covering, furniture and lighting must be approved by Show Management.

8. **Co-Exhibitors:** There will be no co-Exhibition without written approval from PBIAAF. There will be a surcharge for each approved co-exhibition. Any Exhibitor allowing a co-Exhibitor to participate in his rented space without prior written approval from PBIAAF acknowledges the liability of this surcharge and acknowledges any such unauthorized co-participation voids all rights of the Exhibitor.

9. **Security:** A 24-hour security guard service is provided to prevent entry to exhibit area by anyone not authorized by the Organizer or not wearing proper badges for admission to such areas. The watchman service supplied does not guarantee Exhibitor against loss, neither does it imply any assumption of liability for Exhibitor's property by the premises or show organizers. Merchandise securely passes with an authorized signature and/or passes issued by PBIAAF must be utilized. The above is for the protection of all Exhibitors and shall not be construed as any guarantee or indemnification whatsoever to the Exhibitors against loss or theft or otherwise, nor does it imply an assumption of liability by PBIAAF with respect to Exhibitor's property.

10. **Release of Liability:** PBIAAF will not accept any responsibility for the well being of any art and materials consigned to or in the ownership of any Exhibitor using PBIAAF. The Exhibitor waives any and all claims against PBIAAF for loss, theft, damage, or destruction by fire, water, or otherwise of any art, work, crates, packing materials, etc. on the premises of PBIAAF at any time as well as for injury to himself, his agents, servants and/or employees while in the exhibition premises, and for any damage of any nature including damage to his business by reason of the failure to provide space for his exhibit or for any failure to hold exhibition as scheduled.

11. **Insurance and Release of Liability:** Exhibitor must carry worker's compensation, commercial general liability including products and completed operations, independent contractors, personal injury and blanket contractual liability insurance at limits of at least $500,000 per occurrence and, $500,000 per aggregate. These coverages must be evidenced by a Certificate of Insurance with a 30 day notice of cancellation provision to the holder and naming PBIAAF as additional insured at least 30 days before the premium exhibit date. It is strongly recommended the Exhibitor also carry insurance to cover loss, damage, or injury to any property of the Exhibitor or to any of his officers, agents, employees or contractors, whether attributable to accident, fire, theft or any other cause whatsoever. While the exhibition may provide security guards, it is done solely as an accommodation to Exhibitors. The Exhibitor expressly agrees to save and hold harmless PBIAAF, their management, agents, and employees from any and all claims, liabilities and losses for injury to persons (including death), or damage to property arising in connection with Exhibitor's use of the exhibit space.

12. **Authenticity:** Should the authenticity of any work of art be placed in issue during the course of the exposition, PBIAAF reserves the right to have said work withdrawn from the exposition at the request of the Vetting Committee and/or the Fair Organizers. All such decisions are at the sole discretion of the Vetting Committee and/or the Fair Organizers. All Exhibitors are strictly responsible for the authenticity of the works of art which are shown or sold at the exposition. The Exhibitor shall indemnify and hold PBIAAF harmless against any claims whatsoever made with regard to the authenticity of any work with regard to any misrepresentation of any irregularity made with respect to the sale of any artwork at the exposition, as well as any expense incurred by PBIAAF, including attorney's fees.

13. **Catalogue:** An official catalogue is to be published for PBIAAF. No claim can be entertained with respect to errors or omissions in the catalogue. The Exhibitor shall be responsible for the content of the entries and for any damage claimed through the publication thereof. Each Exhibitor may be restricted to a maximum number of pages in the catalogue. Color catalogue preparation fees may be required from each exhibitor.

14. **Promotional Activities at PBIAAF:** Cinema, video, audio, printed material and posters are not permitted at PBIAAF.

15. **Special Wall Arrangements:** Any alterations in booth structure must be approved in writing by PBIAAF and will be at the expense of the Exhibitor. Requests for additional wall buildout, wall coverings or special wall arrangements other than the standard amount furnished shall be submitted to the PBIAAF office no later than the scheduled dates, as outlined in the Exhibitor's Instructional Manual. Additional wall construction and wall coverings will be at additional charge.

16. **Restrictions:** Signage: All signage for PBIAAF must be show standard. No Exhibitor will be allowed to mount, display or post non-uniform signage without prior written approval. Furniture: All furniture must be show standard. No additional furniture, displays, storage units or similar furnishings will be allowed without prior written approval. Lighting: All lighting must be show standard and supplied by PBIAAF. No individual Exhibitor lighting systems will be permitted at PBIAAF.

17. **Exposition Cancellation:** Should any contingency prevent the holding of the exhibition, other than from a direction or omission of PBIAAF, the Organizers may in just part of Exhibitors' rental, as shall be required in compensation for expenses incurred up to the time such contingency shall have occurred. Both parties will be relieved of any other and all further liability. PBIAAF shall not incur any liability whatsoever in case of such cancellation.

18. **Exhibitor Release and Responsibility:** Exhibitor agrees to indemnify and hold PBIAAF harmless for any claims arising out of negligence of Exhibitor, his agents, or employees. Exhibitor agrees to obtain adequate insurance against any such claims and to produce evidence of such insurance if requested by PBIAAF. Exhibitors must remain with all artwork and/or their freight until the designated shipper has removed same from premises.

19. **General Remarks:** Special Exhibition badges must be worn by Exhibitors' staff.
20. Verbal agreements, individual permits and ... amendments must be confirmed in writing.





1. Subject to the terms and conditions of the Exhibitor's Agreement between the Palm Beach International Art & Antique Fair (hereinafter referred to as PBIAAF) and the Exhibitor and these rules and regulations, the Exhibitor shall have access to the Exhibition Facility on the dates and during the hours to be designated by PBIAAF; however, this will be no earlier than 10:00 a.m. on Monday, January 29, 2001, and no later than 1:00 p.m. on Monday, February 12, 2001. Additional setup time may be available to exhibitors by prior written agreement.

2. PBIAAF reserves the right to prohibit any exhibit or proposed exhibit and to permit only such artwork and conduct as PBIAAF may approve. This reservation covers all persons, things, conduct, printed matter, advertising, souvenirs, emblems, and all matters which affects or may affect the fair. All printed matter to be distributed by the Exhibitor at the fair must be submitted to PBIAAF for approval prior to such distribution.

3. Except as otherwise set forth herein, PBIAAF shall be responsible for providing to the Exhibitor, free of additional charge, a basic exhibit booth sufficient in construction and design to permit, in the opinion of PBIAAF, appropriate display of the Exhibitor's exhibit. All exhibit booths must have a ceiling to be installed at the expense of the exhibitor. No exhibit booth may be so high along the front or sides of the exhibit booth as to hide the adjoining or neighboring exhibit from the view of visitors passing along the aisles. All electrical and decorating work will be undertaken, at the Exhibitor's sole cost and expense, by contractors designated by PBIAAF. Details of the electrical and decorating contractor will be forwarded to the Exhibitor upon execution of the standard Exhibitor's Agreement and this Appendix A.

4. PBIAAF will inform the Exhibitor of the official opening and closing hours of the area of the Exhibition Facility in which the Exhibitor's space(s) is (are) located as well as any special rules and regulations pertaining to that area, including without limitation, details concerning the installation, operation and dismantling of the Exhibitor's exhibition. The Exhibitor agrees to comply with all existing rules and regulations without reservation or appeal.

5. All of the Exhibitor's exhibits must be delivered to the Exhibition Facility and set up on the dates and at the times to be designated by PBIAAF. The Exhibitor's exhibit must be set up and ready for viewing prior to the date and time to be designated by PBIAAF. The Exhibitor may not use a non-exhibiting dealer or any of its employees, representatives or agents, to assist in setting up the Exhibitor's exhibit.

6. Each Exhibitor is responsible for obtaining its own insurance coverage. PBIAAF disclaims any responsibility or liability for any loss or damage to person or property in connection with the fair. All exhibits and other property brought into the Exhibition Facility by the Exhibitor shall be at the sole risk of the Exhibitor. The exhibitor, his employees, agents, and assigns hereby unconditionally release PBIAAF from any responsibility whatsoever for any loss or damage to person or property in connection with the fair.

7. The Exhibitor is entirely responsible for the exhibit space(s) and agrees to reimburse PBIAAF for any damage to the floor, walls or equipment used in connection with the exhibit space(s). The Exhibitor shall not drive nails into, gouge, scrape, paint, place tape upon or in any way mar or mark the surface of the floor.

8. The Exhibitor must make written application to PBIAAF for security passes to be issued to the Exhibitor and its employees, representatives and agents necessary to set up and/or dismantle the Exhibitor's exhibits. All such individuals must report to the Exhibitor Services office or designated Security Office on arrival at the Exhibition Facility. Such security passes shall be valid on the dates and during the times to be designated by PBIAAF. All such security passes shall become void at the time specified by PBIAAF for the completion of such set up and/or dismantling of the fair.

9. The Exhibitor must make written application to PBIAAF for security passes to be issued to the Exhibitor and its employees, representatives and agents necessary for the efficient operations of the Exhibitor's exhibit. Such security passes shall be valid on the dates and during the times to be designated by PBIAAF, including without limitation during the opening and closing hours of the fair, must be retained by such individuals at all times during the Show and must be presented to the Exhibition Facility security officers upon request.

10. PBIAAF will provide 24-hour perimeter security services from 10:00 a.m. Monday, January 29, 2001, to 1:00 p.m. Monday, February 12, 2001, but shall assume no responsibility whatsoever for any loss or damage to the property of the Exhibitor. The Exhibitor may, at its own cost and expense, arrange through an independent security company for its own security service.

11. All activities of the Exhibitor must be confined within the exhibit space(s) and conducted as consistent with a major noted first-quality international art and antique fair. Sound-producing devices and/or sound amplification equipment, may not be installed or operated, without the express authorization of fair organizers.

12. The Exhibitor, at its sole cost and expense, must keep the exhibit space(s) at all times properly presented and maintained consistent with first-quality presentation at all times. In addition, the Exhibitor must remove all packing crates and debris from the exhibit space(s), no later than the date and time designated by PBIAAF. Exhibitors should clean the exhibit space(s), and remove all exhibit coverings and dust the exhibits at least one hour before the Exhibition Hall is open to the public each day.

13. PBIAAF and its employees, representatives and agents may at all times enter upon, pass over, through, and/or across the exhibit space(s) for any reason whatsoever, including without limitation, for the purpose of gaining access to or doing any work on any other part of the Exhibition Facility or the fair.

14. No refreshment or liquor of any kind may be supplied or stored in the Exhibition Hall by the Exhibitor, without prior approval. Smoking is not allowed in the Exhibition Facility by state law.

The Exhibitor's exhibit shall be presented and the privileges granted under the Exhibitor's Agreement and Appendix A shall be exercised in strict conformity with all applicable federal, state and local laws, rules and regulations. In addition, the Exhibitor shall keep at all times all entrances, exits, gangways, passages, stairways, corridors and aisles, clear and free and other areas used by the public free of all obstructions and respect all fire laws and codes.

16. The Exhibitor shall be responsible for obtaining any necessary licenses or permits and for the payment of all taxes imposed by any taxing authority in connection with the rental of space, decoration thereof, use thereof, and/or sales therein, as well as any other activities in connection with participation in this fair subject to the Exhibitor's Agreement and Appendix A thereof.

Jun 30 03 09:57a      Alfred E. Warrington V      904-462-0639      p.5

Jun 03 03 09:55      EGR   ATLANTA GA6      770-458-2673      p.7

18. All exhibits must be properly attributed and labeled, and of such a standard and in such condition, taking into account its age and importance that its exhibition will not be contrary to the best interest of the Show as a whole. The Vetting Committee may refuse objects which are not deemed to be show worthy, including objects that are not necessarily fake, but are not felt to be of sufficient quality for the fair.

The appropriate Vetting Committee shall take into account that the statements concerning attribution and condition shall not be such as might be misleading. The following standards must be adhered to by the Exhibitor.

EACH AND EVERY ITEM EXHIBITED MUST HAVE A DESCRIPTIVE LABEL STATING THE NAME OF THE ARTIST, MEDIUM OF THE WORK, DATE OF EXECUTION, COUNTRY OF ORIGIN, AND PROVENANCE. Each and every item must be labeled PRIOR to the beginning of the Vetting process. An exhibitor's failure to label appropriately will lead to the removal of the objects concerned, or the closure of the exhibit space for the duration of the fair. The size of the label shall be in keeping with the exhibit.

(a) The dateline for the fair is that 75% of those modern paintings shown by each Exhibitor must have been executed no later than 1950 and all modern paintings must have been executed prior to 1970 unless an exemption has been made in advance by the Vetting Committee and/or Fair Organizers. Further, in all categories, all exhibits should relate to the period they apparently represent, and later copies or pastiche will only be allowed at the discretion of the appropriate Vetting Committee.
(b) Antiques or works of art with which the appropriate Vetting Committee is satisfied must be:
i. antique or works of art of the period which they are representative of;
ii. in their original form;
iii. must be at least 100 years old to be labeled antiques.
(c) Regilding of mirror frames, gilt chairs and other furniture may be permitted at the discretion of the appropriate Vetting Committee provided that such regilding does not exclude evidence of antiquity, and that the object is labeled as such.
(d) A major restoration is not permitted and the decision as to what constitutes a major or minor restoration will be determined solely by the appropriate Vetting Committee:
(e) Reductions, including prints or maps with trimmed tops and side margins are not allowed;
(f) Each exhibit must be labeled with the date and country of origin.
(g) No exhibit shall be permitted to include the following under any circumstances:
i. Any exhibit having been so restored as to exclude evidence of serious or extensive damage;
ii. Marriages of any kind; that is items made of two or more individual sections each of which originally formed part of other different items;
iii. Any exhibit having additions, subtractions later enrichment or any alterations which change its original character or enhance its value; and,
iv. Items which are, in the opinion of the appropriate Vetting Committee, other than in the best interest of the Fair. For example, (but without limitation):
  . Reductions in depth or size generally of any pieces such as sideboards or tables;
  . Plain pieces which have been carved, inlaid or cross-banded at a later date;
  . Mirrors with original designs altered or with decorated glass borders or panels which are not as the original;
  . Gilt gesso tables with new gesso tops;
  . Furniture with a solid plinth altered to bracket feet or bracket feet replaced by plinth;
  . ...wooden doors altered to glass or wire cages;
  . ...and furniture repainted with embellishments or a change of color;
  . Settees and chairs which originally had cane seats but are now upholstered;
  . Clocks in which the original movements have been entirely replaced;
  . Prints or maps in which the pictorial surface has been reduced or has modern coloring.
(h) Furniture: The dateline for all antique furniture is 1900.
(i) ...century furniture of exceptional merit created in the style of an earlier period is permissible, providing that it is correctly labeled as such and providing that the items are not direct copies of an earlier period. 20th century copies of an earlier period are not permissible.
(i) Sculpture: The dateline for the fair is that 75% of sculptures shown by each Exhibitor must have been cast no later than 1930 and all sculpture must have been cast prior to 1970 unless an exemption has been made in advance by the Vetting Committee and/or Fair Organizers. All bronzes must be dated with both the original conception of the model and the date of the casting offered for sale. If a precise date of a casting is unknown, the gallery must provide a cutoff date. In the Palm Beach International Art & Antique Fair, no posthumous castings of sculpture are permitted unless specifically authorized by the artist during his or her lifetime. Reference documents must be supplied
(j) Paintings, drawings, prints, sculptures, and textiles must bear a label clearly stating the name of the artist with his or her dates or the date of his or her exhibit. If the artist is unknown, the school and approximate date must be stated, e.g. "English School, later half of 18th century."
(k) Works of decorative origin must be properly labeled. Any exhibit made in a later period than its general style suggests shall be labeled to indicate its approximate date.

19. Any and all requests for exceptions to the above rules and regulations pertaining to the Vetting guidelines must be submitted in writing to the organizers of the Palm Beach International Art & Antique Fair 30 days prior to setup. Such written requests do not serve as guaranteed exceptions or waivers of the rules herein.

20. In the event that the Vetting Committee determines an exhibited object or objects to be inconsistent with show standards, the Exhibitor will have the object removed and stored at his own expense, outside of the Exhibition Facility.

21. The Exhibitor shall furnish the exhibit space(s) with a sufficient display of exhibits and shall ensure that its employees, representatives and agents are in attendance on or at every exhibit space occupied by the Exhibitor at all times during the hours that the Show is open to the public.

22. A Merchandise Security Pass must accompany each article sold by the Exhibitor and must be shown to the Exhibition Hall security officer on leaving the Exhibition Hall. Sufficient Merchandise Security Passes will be given to each Exhibitor by PBIAAF during setup.

23. Each and every exhibit and all boxes, packing material, and debris of whatsoever nature used in connection with the Exhibit Space(s) must be removed from the Exhibition Facility and grounds by the Exhibitor, at his/her own cost and expense, not later than the date and time to be designated by PBIAAF. In the event of the Exhibitor's failure to vacate said premises as herein provided. PBIAAF may, and is hereby authorized and made the agent of the Exhibitor to remove and store the exhibit and all other materials of any nature whatsoever and shall reimburse PBIAAF for expenses thus incurred.

24. ...PBIAAF may amend these and any further rules and regulations relating to the fair or adopt additional rules and regulations as it may deems desirable from time to time, which shall be in its sole discretion. Failure of PBIAAF to insist in any one or more instances upon the observance and/or performance of any of these rules and regulations shall not constitute a waiver of any subsequent breach of such rules and regulations or the requirements for the Exhibitor to strictly observe any rule or regulation promulgated in the past or future.

AGREED: _____      Authorized Signature

Jun 30 03 09:59a     Alfred C. Warrington V      904-462-0836      p.6

26/01/2001   12:20     828-74__3269

nt By: IFAE;                    561 220 8640;      Jan-25-0__:27PM;      Page 2/2

DAVID MORRIS                                                    PAGE  02/02

# IFAE

Exhibitors Manual

## Shipment Handling Authorization & Release and Limit of Responsibility

### Drayage Services

The Exhibitor hereby authorizes Palm Beach Int'l Art & Antique Fair to handle the Exhibitor's shipment(s) in accordance with the terms and conditions set forth herein and in the "Limit of Liability" section of this form.

The Exhibitor expressly agrees to Palm Beach Int'l Art & Antique Fair limitations of liability and responsibility as set forth herein. The Exhibitor hereby expressly agrees that Palm Beach Int'l Art & Antique Fair liability, if any, not withstanding any other measure of liability contained in the Exhibitor's Agreement, shall be limited to any loss or damage which results solely from Palm Beach Int'l Art & Antique Fair negligence in the actual physical handling of the Exhibitor's artwork or shipment and not for any other type of loss or damage, actual or consequential.

The Exhibitor agrees in connection with the receipt, handling, storage, and reloading of the Exhibitor's artwork and packing materials at the exhibition site that Palm Beach Int'l Art & Antique Fair will provide its services only as the Exhibitor's agent and not as bailee or shipper. If any employee of Palm Beach Int'l Art & Antique Fair shall sign a delivery receipt, bill of lading or other documents, the Exhibitor agrees that Palm Beach Int'l Art & Antique Fair will do so only as the Exhibitor's agent. The Exhibitor hereby authorizes Palm Beach Int'l Art & Antique Fair to sign for shipments on the Exhibitor's behalf and accepts the responsibility for Palm Beach Int'l Art & Antique Fair signing on the Exhibitor's behalf.

Relative to inbound shipments, consistent with trade show industry practices, there may be a lapse of time between the delivery of Exhibitor shipment(s) to the booth and the arrival of the Exhibitor or his representative. During such time the shipment will be left unattended in the Exhibitor's booth. Palm Beach Int'l Art & Antique Fair will not be responsible for loss, damage, theft, disappearance of Exhibitor's materials after the same has been delivered to show site. Palm Beach Int'l Art & Antique Fair highly recommends the retainment of security services to be in attendance for left in the Exhibitor's booth in the Exhibitor's absence prior to or during set up.

Relative to outbound shipments after the show, consistent with trade show industry practices, the Exhibitor recognizes that there may be a lapse of time between the Exhibitor's completion of packing and the actual pick-up of the Exhibitor's shipment from the Exhibitor's booth for loading by a carrier. During such time, the Exhibitor's shipment will be left unattended in the Exhibitor's booth. The Exhibitor agrees that Palm Beach Int'l Art & Antique Fair shall not be responsible for any loss or damage during such period. The Exhibitor understands that Palm Beach Int'l Art & Antique Fair recommends that Exhibitors physically stay with their shipments until removal by their carrier and/or employ a private security service to remain with such shipment(s) on the Exhibitor's behalf.

Absent the physical presence of the Exhibitor or a designee at the time of removal of Exhibitor's shipment by a carrier, the Exhibitor authorizes Palm Beach Int'l Art & Antique Fair to adjust the quantities of items on any bill of lading left with Palm Beach International Art & Antique Fair to conform to the actual count of such items in the booth, at the time of pick-up.

In order to expedite removal of materials, Palm Beach Int'l Art & Antique Fair shall have authority to charge designated carriers, if such carriers do not pick up on time. Where no disposition is made, materials will be sent to a third party warehouse at Exhibitor's expense, awaiting Exhibitor's shipping instructions. All charges must be paid before release of goods.

### Limit of Liability

1. Palm Beach Int'l Art & Antique Fair shall not be responsible for damage to uncrated materials, materials improperly packaged, or concealed damage.

2. Palm Beach Int'l Art & Antique Fair shall not be responsible for loss, theft, or disappearance of materials after same has been delivered to Exhibitor's booth.

3. Palm Beach Int'l Art & Antique Fair shall not be responsible for loss, theft, or disappearance of artwork, materials, or shipment before they are picked up from Exhibitor's booth for reloading after the show. In the absence of the Exhibitor or his designated agent, bill(s) of lading covering outgoing shipments, which are furnished by shippers to Exhibitors, may be checked at time of actual pick-up from booth and corrections made where discrepancies occur.

4. Palm Beach Int'l Art & Antique Fair shall not be responsible for any loss, damage, or delay due to acts of God, strikes, lockouts or work stoppages of any kind.

5. In the event that Palm Beach Int'l Art & Antique Fair shall be deemed to have any liability whatsoever for loss or damage to Exhibitor's shipment, Palm Beach Int'l Art & Antique Fair's liability shall be limited to the physical loss or damage to the specific article which is lost or damaged, and in any event Palm Beach Int'l Art & Antique Fair's maximum liability shall be limited to $.50 per pound per article with a maximum liability of $50.00 per item, or $1,000.00 per shipment, whichever is less.

6. Palm Beach Int'l Art & Antique Fair shall not be liable to any extent whatsoever for any actual, potential, or assumed loss of profits or revenues, or for any collateral costs, which may result from any loss or damage to an Exhibitor's materials which may make it impossible or impractical to exhibit same.

7. The consignment or delivery of a shipment to Palm Beach Int'l Art & Antique Fair by an Exhibitor, or by any shipper to or on behalf of the Exhibitor, shall be consigned as an acceptance by such Exhibitor (and/or shipper) of the terms and conditions set forth herein.

DAVID MORRIS
_____
Name of Gallery

Ian Rose
_____
Authorized Signature

26.01.0
_____
Date

This form must be executed and received by Palm Beach International Art & Antique Fair prior to receipt of freight.

From        David Morris International Ltd
            24/25 New Bond Street
            London
            W1

To        T E D E N & C O M P A N Y

Callingnate House, One Angel Court, High Street,
Godalming, Surrey GU7 1DT

Ref No        104070/RJFT/NM

Subject to        Interested Insurers

admitting liability I/We hereby offer to accept the sum of  £1,635,158.01 (ONE MILLION SIX

    HUNDRED & THIRTY FIVE THOUSAND ONE HUNDRED & FIFTY EIGHT

    POUNDS & ONE PENCE)

in full settlement and discharge of all claims under Policy No.   N0020180 502-AAFV3586

for loss and damage occasioned by  Theft

which occured at:   The Palm Beach International Art & Antique Fair, Booth 460, 400 Lakeview

    Drive, West Palm Beach, Florida 33401, USA

on   11th February        2001   and I/We declare that within our knowledge there was no other

insurance covering this risk at the time of the said loss.

Date   12th March        2001

Signature        
    (For and on behalf of David Morris International Ltd)

£  1,635,158   01

EXHIBIT

B